**SNAKE RIVER RANCH, a general partnership, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. C74–91.**

United States District Court,
D. Wyoming.

May 19, 1975.

James O. Wilson, Loomis, Lazear, Wilson & Pickett, Cheyenne, Wyo., and Clyde O. Martz and Howard L. Boigon, Davis, Graham & Stubbs, Denver, Colo., for plaintiff Snake River Ranch.

John E. Lindskold, Dept. of Justice, and Tosh Suyematsu, Asst. U. S. Atty., for the District of Wyoming, for defendant United States of America.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KERR, District Judge.

### FINDINGS OF FACT

1. This is an action brought by the Snake River Ranch against the United States of America pursuant to 28 U.S.C. § 2409a to quiet title to certain lands (disputed lands) lying between the thread of the Snake River and the surveyed meander line of the river in Lot 5, Section 29, Lot 4, Section 31, and Lots 2, 3 and 6, Section 32, in Township 42 North, Range 116 West, 6th P.M., Teton County, Wyoming (platted lands). Plaintiff, as successor to the patentees of the platted lands, claims title to the disputed lands on the basis that the patents to the platted lands encompassed all lands, created by accretion or otherwise, between the meander line thereof and the thread of the Snake River. The action was brought in response to the assertion of title to the disputed lands by the United States on the theory that said lands had been omitted from the original Government survey of the platted lands by reason of fraud or gross error of the surveyor and had, therefore, not been included in the patents to the platted lands.

2. That plaintiff is a general partnership, duly created and existing under the laws of the State of Wyoming, with Stanley R. Resor, Ann R. Laughlin and

Helen R. Hauge as the general partners thereof.

3. At all times and places pertinent to this action, the Snake River has been nonnavigable.

4. That Lots 2, 4 and 5 of Section 29, Township 42 North, Range 116 West, 6th P.M., Teton County, Wyoming, described in the Government plat to contain 102.28 acres, were conveyed by the United States Government by patent to William T. Crawford on June 29, 1921, Patent No. 813091, and by mesne conveyances record title to Lot 5 is in plaintiff Snake River Ranch, subject to easements, reservations or other restrictions of record.

5. That Lots 4 and 5 and the SE ¼ NE¼ of Section 31, Township 42 North, Range 116 West, 6th P.M., Teton County, Wyoming, described in the Government plat to contain 119.29 acres, were conveyed by the United States to Francis E. Waterman by patent dated September 12, 1913, Patent No. 354856, and be mesne conveyances record title to Lot 4 and the SE ¼ NE ¼ of said section is in plaintiff Snake River Ranch, subject to easements, reservations and other restrictions of record.

6. That the NE ¼ NE ¼, NW ¼ NE ¼, NE ¼ NW ¼ and SW ¼ NE ¼ of Section 31, Township 42 North, Range 116 West, 6th P.M., Teton County, Wyoming, described in the Government plat to contain 160 acres, were conveyed by the United States to John R. Seaton by patent dated February 27, 1908, Patent No. 1149681, and by mesne conveyances record title to the NE ¼ NE ¼ of said section is in plaintiff Snake River Ranch, subject to easements, reservations and other restrictions of record.

7. That Lots 2 and 3 of Section 32, Township 42 North, Range 116 West, 6th P.M., Teton County, Wyoming, described in the Government plat to contain 31.74 acres, were conveyed by the United States to Stanley B. Resor under the Color of Title Act, 43 U.S.C. § 1068, by patent dated June 19, 1957, Patent No. 1172805, and by mesne conveyances record title to Lots 2 and 3 is in plaintiff Snake River Ranch, subject to easements, reservations and other restrictions of record.

8. That lot 6 of Section 32, Township 42 North, Range 116 West, 6th P.M., Teton County, Wyoming, described in the Government plat to contain .98 acres, was conveyed by the United States to Stanley B. Resor by patent dated May 21, 1959, Patent No. 1195758, and by mesne conveyances record title to Lot 6 is in plaintiff Snake River Ranch, subject to easement, reservations and other restrictions of record.

9. "Appendix A" depicts the location and acreage of the platted lands, the location and acreage of lands included in each patent embodying any of the platted lands and the location and acreage of the disputed lands. The relationship between the acreages recited in the patents and the acreages of the disputed lands is as follows:

| Acreage Stated in Patents | | Acreage of Adjacent Disputed Lands | |
|---|---|---|---|
| Description | Amount | At Date of Patent | At Time of Suit |
| Section 29: | | | |
| Lot 2 | | | |
| Lot 4 | 102.28 | Not known | 3 |
| Lot 5 | | | |
| Section 31: | | | |
| Lot 4 | | | |
| Lot 5 | 119.29 | Not known | 14 |
| SE ¼ NE ¼ | | | |
| Section 32: | | | |
| Lot 2 | | | |
| Lot 3 | 31.74 | 28 | 28 |
| Section 32: | | | |
| Lot 6 | .98 | 0 | 10 |
| TOTALS | 254.29 | | 55 |

10. The platted and disputed lands are integrated in operation as the Snake River Ranch with approximately 3,000 acres of contiguous lands in several sections of Township 42 North, Range 116 West, Township 42 North, Range 117 West and Township 41 North, Range 117 West, 6th P.M., Teton County, Wy-

oming, owned by plaintiff and associated partnerships.

11. Township 42 North, Range 116 West, 6th P.M., was originally surveyed for the United States by William O. Owen, deputy United States surveyor, under Contract No. 250 dated September 2, 1892. The south township line was surveyed in October 1892, the interior section lines were surveyed between May 23 and May 30, 1893 and the meander line of the right bank of the Snake River in Sections 29, 31 and 32 was surveyed on May 28, 1893, according to the field notes of the survey, after the survey of the interior subdivision lines of these sections had been completed.

12. The 1890 General Land Office "Manual of Surveying Instructions for the Survey of the Public Lands" provided the general instructions under which Owen was to conduct the survey, and in addition there were Special Instructions attached to Owen's contract. The Manual stated that the Surveyor General should occasionally field inspect surveys in progress to determine contract compliance; the Special Instructions, as required by the Manual, called Owen's attention to the then-prevailing practice of having all surveys field-checked prior to approval. There is no competent evidence that the field notes were not field-checked in the manner contemplated by the Special Instructions and the Manual. Owen also posted two $9,000 performance bonds. He was not to receive payment under his contract until completion and approval of his work. Upon Owen's certification of completion of his survey, his field notes were examined and approved by the United States Surveyor General and a plat thereof was prepared by the Department of the Interior and certified on August 16, 1894 by the United States Surveyor General to be "strictly conformable to the field notes" of the Owen survey. Owen was paid in full for completing his survey.

13. That the patents described in paragraphs 4–8 herein each described the acreage contained in the lands conveyed "according to the Official Plat of the Survey of the said Land" returned to the General Land Office by the Surveyor General or, in the later patents, on file in the Bureau of Land Management. The plat to which each of these patents referred was that described in paragraph 12 herein and it showed Lots 2, 4 and 5 of Section 29, part of Lot 4 of Section 31, the remainder being bounded by the section line, and Lots 2, 3 and 6 of Section 32 to be bounded on the east by the right or west bank of the Snake River. Said plat showed the Snake River, not a meander line, to be the east boundary of said lots.

14. That at the time of the Owen survey in Township 42 North, Range 116 West, the township was wild, remote, unsettled and of little value and the dense undergrowth and timber along with the lack of roads and the primitive equipment with which Owen worked combined to render the survey very difficult in the vicinity of the Snake River.

15. The Court finds that Owen was a competent and meticulous surveyor in comparison with his contemporaries and the quality of his work was very good. His corners were precisely and accurately monumented, his field notes contain more information than those of his contemporaries and the mechanics of his work were very good.

16. That the 1890 Manual required that the surveyor first run the exterior or township lines and then the interior or subdivision lines, setting monumented corners on the latter to mark sections and quarter sections. At the intersection of any township or subdivision line with a meanderable stream, defined as streams at least three chains in width, the surveyor was to place a monumented meander corner on the bank and describe the monument in his field notes. After he established meander corners on section line intersections with meanderable streams, he was to run meander lines between such meander corners, approximating stream sinuosities of the bank

and setting and describing angle points at each change of course. Owen's field notes described the placement of meander corners and the running of the meander lines in compliance with the Manual instructions.

17. That Owen's contract provided that he would be paid $9 or $13 per mile for base, standard, meridian, and meander lines, $7 or $11 per mile for township lines and $5 or $7 per mile for section and connecting lines, the higher amounts being payable when the lines were run over mountainous lands, or lands heavily timbered or covered with dense undergrowth. He was not to receive additional pay for setting meander corners, each of which would take about an hour to monument. It would have been to Owen's financial advantage to set as few meander corners as possible since he could thereby maximize the mileage of lines run within the time permitted by his contract. He nonetheless set four meander corners on the line between Sections 31 and 32 that bounded the part of the disputed lands.

18. That in the course of the survey of the south township line in October 1892, when the flow of the river was presumably low, Owen noted that he crossed a dry channel on the west side of the river in Section 31, thereafter reached and set a meander corner on what he described as the right bank of the river and then crossed what he called the Snake River from west to east by triangulation along the south section line of Section 32. Of the original monuments set by Owen along this line in Sections 31 and 32, only the south quarter corner of Section 31 has been found; it conformed to the monumentation described in Owen's field notes.

19. That Owen surveyed the section line between Sections 31 and 32 by running north from the south township line of Township 42 North, Range 116 West, and, after noting passage over level land and through dense undergrowth and the crossing of a dry channel, he stated that he placed a meander corner on the right bank of the Snake River at a distance of 19.40 chains from the township line. The notes then state "[t]hence along the River bed" for 10 chains, where he left the river and placed a second meander corner. Proceeding up the section line, he noted encountering the "Right bank again," where he placed a third meander corner. For the next two chains, he noted proceeding "[t]hence along in river" and then left the river "at its right bank" and placed a fourth meander corner at that point, the last meander corner on this section line prior to the corner between Sections 29, 30, 31 and 32. At this point, the notes state that "[a]s the line between Secs. 29 and 32 cannot be projected across Snake River," Owen ran his section line eastward until he encountered the "Right bank of the Snake River, where he set a meander corner.

20. That of these monuments, the northeast section corner of Section 31 has been recovered; it conformed to the monumentation described by Owen and required by the Manual. The north-south section line between Sections 31 and 32, on which Owen set the four meander corners, was re-established by the Bureau of Land Management in a 1971 resurvey to measure 80 chains in length and to deviate only four minutes in course from true north. The Owen meander corner of the right bank on the north section line of Section 32, as re-established by the 1971 Bureau of Land Management resurvey, is in the main channel of the Snake River, east of plaintiff's levee.

21. Owen began his survey of the right bank of the Snake River in Township 42 North, Range 116 West, at the meander corner to fractional Sections 5 and 32 on the south boundary of the township and ran upstream "along low bank through dense thicket and cottonwood timber" along four different courses to the first meander corner previously set on the section line between Sections 31 and 32, noting at the second course "Dry channel leaves river." Owen described the land as "level" with

"low banks" and the vegetation as grass, willows, larch and cottonwood timber; he described the route as 21.24 chains of "dense undergrowth and heavy cottonwood timber." He then described his running of the meander line in Section 31 along "low bank—level land," indicating that he left the brush and timber at one point, and he set two courses to the next meander corner on the section line between Sections 31 and 32. Here he described the vegetation as grass and sage. He then described three courses in Section 32 around what is now Lot 6, containing .98 acres, to the third meander corner, the courses being only 3.7, 2.4 and 2.55 chains, respectively, in length. From this meander corner, the notes indicate a brief re-entry into Section 31, again along "low, level bank," for a distance of less than 2 chains to the fourth meander corner on the section line between Sections 31 and 32, the vegetation again being described as grass and sage. The notes then describe five courses in Section 32 "along low bank through dense undergrowth" to the meander corner on the north section line of Section 32, this being the portion of the meander line of Lots 2 and 3 of Section 32. This route was described as traversing "dense undergrowth of willows, larch, and young cottonwoods." The next several courses set in Section 29 were described as running along "low, level bank, through dense undergrowth of willows, larch and alders" and some "light cottonwood and aspen timber." Again, at one point here it was noted that a "dry channel enters River."

22. That the Owen meander line along the platted lands, as re-established by the 1971 Bureau of Land Management resurvey, substantially conforms to, or lies within, the right bank of the Snake River at both the northern and southern ends of the disputed lands and approximately delineated the right bank adjoining Lot 4 of Section 31 and Lot 6 of Section 32 as recently as 1954.

23. That the careful notation and distinction made by Owen several times in his notes between dry channels adjoining the Snake River and the banks of the river itself in the vicinity of the disputed lands indicates that he did not run his meander line along or in such channels or sloughs but rather surveyed the meander line along the banks of the river. Further, the type of vegetation and terrain described in the field notes indicates proximity to an active channel that was cutting a bank in the vicinity of the south sixteenth corner on the section line between Sections 31 and 32.

24. That the large number of different courses set by Owen on the meander line in Sections 29, 31 and 32, many of which were for extremely short distances, especially in the area of what is now Lot 6, Section 32, as well as the many meander corners on the section line between Sections 31 and 32, are indicative of a meticulous attempt to depict precisely the sinuosities of the Snake River and support the inference that Owen engaged in a careful effort to survey the river as he saw it. Owen was required only to survey the general course of the river and could have worked more rapidly and earned more money by setting fewer meander corners and angle points.

25. The field notes indicate that in several places in the township, including the north section line of Section 32 as described in paragraph 19 herein, Owen was unable to project a line across the Snake River by triangulation or chaining to measure the width thereof; each occurrence of this nature was carefully described and thus presumptively reviewed by the Surveyor General prior to his approval of the field notes and the plat thereof. Such failures to project did not render the river unmeasured since distances could be calculated along the length of each meander line and along each exterior and interior line prior to its intersection with the river. The distances between opposite meander corners were to be measured, according to the Manual, only so that the meander-able streams could be protracted with

entire accuracy. It was not necessary to survey lines across the river to close the survey and the disposal of public lands in the township was not affected by the failure to run such lines since the lots were definitive from the remainder of the survey. Owen was not paid for the distance across the river when crossing was not made, and it may be inferred that Owen believed, and his superiors agreed, that the benefit to be obtained in measuring across the river would have been disproportionately small to the time and effort required to obtain it.

26. That at the conclusion of his field notes for the survey of Township 42 North, Range 116 West, Owen appended the following note:

> In the meanders of Snake and Gros Ventre Rivers, in many places it was impossible to determine just where the banks actually lie, owing to the fact that there is generally no well defined cut to show the exact line of the channel.

> I have run the meanders so as to include what seemed to me to be the channels of the respective streams.

There is no evidence that the meander line of the right bank of the Snake River in Sections 29, 31 and 32, on what is now the property of plaintiff, was run in an area in which Owen found it impossible to determine where the bank lay. The field notes do not reflect any insecurity of Owen concerning the location of his meander corners or angle points in the area of the Snake River Ranch. To the contrary, the frequent references in the field notes to the encountering of banks and to the placing of monuments on the "right bank" of the Snake River in Sections 29, 31 and 32 and the notations of proceeding in the river or river bed (paragraphs 19 and 21 herein), the present existence of the meander corner on the north section line of Section 32 in the channel of the river, the recovery of other Owen meander corners on banks of the river, and the presence of high banks in Sections 29 and 32 support the inference that

Owen was at the bank of the river at least in those instances in which he stated that he was, as he did in Sections 29, 31 and 32, and therefore that the survey line he ran along those points was a true meander line. The quoted statement by Owen at the end of his field notes is unusual for a surveyor to make and is the statement of a conscientious, honest man who was attempting to alert his superiors to the difficult problems he had encountered rather than pretend that he had done a perfect job under ideal conditions.

27. In Teton County, Wyoming, the Snake River is characterized as braided, and has multiple interlacing flow patterns, during low flow periods, around alluvial lands within its channel. The braiding is caused by the carrying of a large sediment load on a steep gradient at high velocity, eight feet per second in the vicinity of the Snake River Ranch, which has resulted in the formation of a wide, shallow channel with either no clearly apparent thalweg (the point of deepest and most rapid flow) at a given point in time or a shifting thalweg over time. The river contains both fine sediment from bank erosion and coarser materials, including large cobbles, and braiding occurs when the heavier sediment becomes deposited at points of diverging current such as behind obstructions caused by the chance lodging of cobbles or bed load. The various braids will become filled by vertical and lateral accretion occurring during the recession of flood waters, and the subsidiary channels by the deposition of sediment as the consequence of the lower flow velocity therein.

The "mean high water mark" of the banks of the main channel, while properly defined as the point of separation between the surrounding vegetation and the water, is more appropriately characterized on the Snake River as the outer boundaries of the braided channel that carries water during a substantial part of the snow-melt high-flow period from May to September of most years, except

in those sections of the river where dikes have been constructed to confine the river within more or less permanent banks. The Snake River in this area, like other braided rivers, has historically been characterized by the migration of its main channel across the flood plain; by the constant shifting and change of the braids within the main channel; by the constant buildup, modification and destruction of gravel bars, cobble bars, islands and other impermanent bodies of land within the main channel in a manner not perceptible during occurrence but clearly apparent at the conclusion thereof; and by the existence at any point in time of subsidiary or side braids that may at one time have been part of the main channel or may in the future become so integrated.

The characteristic migrating of the main channel across the flood plain is caused by seasonal high water in the river, the heavy sediment load and the flatness of the flood plain surrounding the river, which result in the constant formation of new braids and the choking off of existing braids and severe bank erosion. Only in those places where flood control levees have been constructed by the Corps of Engineers of the United States Army has the main channel of the Snake River ceased to shift.

28. During discharges in the river of less than 5,000 cubic feet per second (cfs), the river remains generally confined within braided channels. At discharges of 5,000 cfs or more, some water leaves the braided channels, overflows cobble bars, extends to the limits of the scoured channel and travels in sloughs through the surrounding river valley. At 8,000 cfs, erosion to abutting lands begins to occur. Discharges at the Jackson-Wilson Bridge, about five miles to the south of the property of plaintiff Snake River Ranch, ordinarily exceed 5,000 cfs during four months of a year and are greater than 10,000 cfs for a month a year on the average; average annual discharge in the vicinity of the Snake River Ranch is 3,500 cfs. During flows of 15,000 cfs or more, 2,000 to 3,000 feet in width of the valley floor may be inundated in those areas where there are no levees. The period of high water is ordinarily from May to September, the highest flows occurring in the months of May, June and/or July; the average flood discharge for the period 1903–73 in the vicinity of the Ranch is 8,100 cfs. Large floods with peak discharges in excess of 15,000 cfs at the Jackson-Wilson Bridge have occurred in 1894, 1904, 1907, 1908, 1909, 1910, 1911, 1912, 1913, 1914, 1916, 1917, 1918, 1927, 1928 and 1943, and in several years prior to the construction and extension of levees by the Corps of Engineers in 1960–61, emergencies occurred because of levee destruction from flows of 15,000 to 18,000 cfs at the Jackson-Wilson Bridge. In early June 1894, one year after the Owen survey, there occurred on the Snake River the largest recorded flood of streams in the Northwest that derive their run-offs from snow-melt, the estimated flood peak at the Jackson-Wilson Bridge being 42,000 cfs, or 216% of the 1904–53 average peak natural discharge of 19,400 cfs, and the May-July run-off volume in 1894 being 3,137,000 acre-feet, or 184% of the 1904–53 average of 1,700,000 acre-feet.

29. The regimen of the river has undergone substantial change since the Owen survey of 1893 as a consequence of cyclical changes in climate, operation of Jackson Lake as a river regulating reservoir and construction of flood control dikes along the channel. The first dam was constructed at Jackson Lake, approximately 50 miles to the north of the property of plaintiff Snake River Ranch, in 1906. The dam was strengthened and enlarged in 1912, and in 1916 the reservoir at the lake was dredged to provide greater storage capacity. Since that time the reservoir at Jackson Lake has been utilized to regulate the annual river discharge for irrigation purposes, causing reduction of flood peaks while maintaining high discharges in the river for longer periods; both the flood peaks

and the mean annual discharges of the Snake River decreased markedly after 1918 until 1945. Along with the construction of levees in places along the river, this modification in discharge levels has limited the formerly large-scale lateral movements of the channel, and has also caused more braiding to occur within the channel. The regulation of the river at Jackson Lake has had the effect of narrowing the channel.

30. That Plaintiff's expert witnesses were well-qualified by training and experience to evaluate the changes in the river channel that occurred in the vicinity of the Snake River Ranch by reason both of the above-described changes in the hydrologic and geomorphic characteristics of the river in general and the ordinary changes in the channel that can be expected to occur from year to year because of the river's known proclivities. The experts conducted systematic sampling of the soil composition of cobble bars, the disputed lands and the platted lands to determine their relative ages and their capabilities to start and maintain tree growth, and they made systematic corings and analyses of tree growths on the disputed and platted lands to ascertain the scope of channel changes and accretions in the area of the disputed lands subsequent to the date of the Owen survey. Their findings and testimony, described in succeeding paragraphs, supported the conclusions of Dr. Stanley Shumm, renowned geomorphologist, that not only was there no indication that the Snake River did not flow along the Owen meander line in 1893 on what is now the Snake River Ranch but also that all available evidence supports the conclusion that the disputed lands were created by accretion approximately 60 years ago.

31. There are old channel scars to the west of the Owen meander line as well as evidence of cobble bar configuration in that area. Although there is not evidence of recent high-velocity flow of the river west of the meander line, there is evidence of recent periodic inundation of that area and recent high-velocity flow of the river west of present bank line. Aerial photography of the disputed lands over a period from the 1930's until October 1974 demonstrates significant channel shifting over a 2,500-foot expanse to the east of the levee line on the west bank of the river; in the year between 1973 and 1974 photographs, the thalweg shifted 500 to 600 feet to the west adjacent to the disputed lands and shifted 1500 feet in a nearby area. By 1954, two principal braids of the river shown to exist in a 1945 photograph on the southern portion of the disputed lands, in part over Lot 6, Section 32, had become significantly smaller because of the deposition of sediment therein.

32. The 1894 flood was of a magnitude sufficient to cause many changes in the river valley generally, and in the area of the disputed lands in particular. Assuming the accuracy of the Owen meander line, the flood could have caused the movement of the channel 200 feet to the west in the north of Lot 2, Section 32, and the south of Lot 5, Section 29, depicted on a topographical map of the United States Geological Survey in 1901 from a topographical mapping of the area done in 1899. The flood could also have caused the 200 to 300 foot shift eastward by the channel along the central portion of the disputed lands as shown on the USGS map. The period of large flood peaks from 1904 to 1918 could have caused deposition of finer materials in the areas of reduced velocity and thereby could have caused some accretion in the area of the disputed lands, as depicted by Dr. Shumm in his exhibit hypothesizing the location of the 1913 channel. Erosion in the area of the section line between Sections 29 and 32 could be expected to have resulted in deposition and accretion in the area of the disputed lands; deflection of flow by resistant sediments on the west bank to the north of the disputed lands in the area of the source of the mill stream, and the consequent curving of

the river toward the east, would cause bank erosion in that area and the deposition of such eroded materials downstream on the west bank and into side channels such as the mill stream. Such depositions would be initially in the form of gravel bars that would build from progressive depositions and become colonized by vegetation following the recession of flood waters. Especially in times of flood, the river is carrying sufficient sediment to result in significant deposition and accretion and could have created accreted lands of the magnitude of the disputed lands on the Snake River Ranch.

33. Reduction in flood peaks and mean discharges after 1918 created a condition that was favorable to vertical and lateral accretion of land in the area of and the commencement of tree growth on the disputed lands. The "mill stream" that currently runs part of the way along the meander line on the disputed lands must be periodically dredged by plaintiff because of its tendency to fill with silt from the river. Soil sampling on the disputed lands and lands adjacent thereto indicated that the area to the west of the meander line has not been under water for a significantly long time, there being a high percentage of fine materials therein that would be accumulated from wind deposition and from sedimentation over a long period of time. The samples from the disputed lands contained significant, though lesser, percentages of fines, and the samples from cobble bars in the channel of the river contained very small percentages of fines and were composed primarily of cobbles. The smaller percentage of fines found on the disputed lands indicates that the area has more recently been part of the river than has the area west of the meander line. The area of the disputed lands that was part of the channel as recently as 1954 (paragraph 31 herein) has accumulated significant deposition of fine materials, enough to sustain tree growth.

34. The tree growth on the disputed lands is exclusively cottonwood, which is a "pioneer species" that is characterized by its germination immediately after the cessation of a disturbance such as the release of land by water because it is a species that cannot withstand competition from other vegetation. The cottonwood seed requires a continuing supply of water, no "litter" or other vegetation and a mineral seedbed. It can become established on a gravel bar because of the existence of some fines mixed with the cobbles. The soil on the disputed lands is shallow and is not good for cottonwood growth but is excellent for cottonwood establishment. On the disputed lands are five discrete stands of cottonwood, the average age of each stand having been computed to be 47.7, 55.2, 61, 54.5 and 61.2 (plus or minus sampling errors) years, respectively, and the average age of all the trees being 56.54 years. The germination of these stands thus corresponds to the end of the period of high flood peaks and mean discharges, and the growth of the trees corresponds to the years of reduced discharges in the river. The oldest tree sampled in the general area of the platted and disputed lands was located just to the west of the meander line and was at least 147 years old. The largest tree in the group 30 feet to the east of this tree, and to the east of the meander line on the disputed lands, was 63 years old.

35. That there is no credible evidence suggesting that the Owen meander line was not an accurate depiction of the west bank of the Snake River in Sections 29, 31 and 32 of Township 42 North, Range 116 West, 6th P.M., at the time of the survey thereof in May 1893.

36. That there is no credible evidence that the disputed lands were an island in 1893 at the time of the Owen survey. There is no vegetation or tree growth on the disputed lands indicating that any of said land has been in place longer than approximately 60 years.

37. The property adjacent to the disputed lands in Sections 29 and 31 was acquired by the Resor family on October 11, 1929 by warranty deed from Coulter D. and Margaret P. Huyler to Stanley B. Resor, father of the general partners of plaintiff Snake River Ranch, the deed conveying the SE ¼ NE ¼ and Lot 4 of Section 31, N ½ NE ¼, NE ¼ NW ¼ and SW ¼ NE ¼ of Section 31, S ½ SE ¼ of Section 30, Lot 5 and SW ¼ SW ¼ of Section 29, S ½ NE ¼ SE ¼ of Section 30, and S ½ NW ¼ SW ¼ of Section 29. In the previous year, Executive Order 4857 had withdrawn from settlement, location, sale or entry those portions of Sections 29 and 32 "east of the Snake River," and on February 4, 1929, Executive Order 5040 withdrew the remainder of the public lands in Township 42 North, Range 116 West, from entry. The Resor family, believing that the lands it had purchased from the Huylers extended to the Snake River, constructed a number of improvements in the 1930's in Section 32 between the section line along Sections 31 and 32 and the right bank of the Snake River, on the lands that had been withdrawn from entry in 1929. The improvements included the main ranch cabin and main barn, manager's house, milk house, ice house, storage sheds, a family cabin, bunkhouse, blacksmith shop, saddle shed, powerhouses, a wood and stone flood-control levee on the west bank of the Snake River beginning near the north section line in Section 32 and extending south along the bank in that section, and a headgate to control the flow through the mill stream. Construction was begun on a dining room and kitchen over the mill stream, but the flood of 1943 washed out that building before it was completed and also washed out the levee as well as flooding several of the ranch buildings. Thereafter, Stanley Resor, Sr. constructed over the next two years on the west bank in Section 32, at a cost of approximately $60,000, a 1,700-foot levee protected by dumped stone and a series of dumped stone groins.

38. On February 25, 1955, Public Land Order 1077 revoked the above-described withdrawal orders and restored to entry the public lands in Township 42 North, Range 116 West that had previously been withdrawn. The Resor family, upon receiving notice of this restoration order, realized for the first time that it did not have record title to Lots 2, 3 and 6 and that some of the ranch improvements were on lands that it did not own. Believing that Lots 2, 3 and 6 were the only lands between the bank of the river and the lands for which he had record title, Stanley Resor, Sr. applied for color of title patents to Lots 2 and 3, pursuant to 43 U.S.C. § 1068, and for a small-tract, competitive-sale patent to Lot 6. The color-of-title application included, inter alia, an affidavit of Stanley B. Resor to the effect that he had occupied Lots 2 and 3 since 1929 in the good-faith belief that he owned the lands to the river. Attached to the affidavit was a list of 23 separate improvements stated to have been constructed on Lots 2 and 3, of which all or part of the barn, bunkhouse, ice house, machine shop, saddle house, powerhouse, milk house, and a family cabin were east of the meander line and thus on the disputed lands. The value of the improvements east of the meander line, including the levee, was approximately $125,000 as of the date of this affidavit. Also appended to the affidavit was a plat prepared by surveyor David Miller from a survey he conducted on the Snake River Ranch in the summer of 1955 showing that Lots 2, 3 and 6 were bounded on the east by the bank of the Snake River and that the improvements were on Lots 2 and 3. Following investigation and verification of the information contained in the application, the United States issued a color-of-title patent to Stanley B. Resor for Lots 2 and 3 on June 19, 1957. Mr. Resor received such patent in the belief that he was thereby acquiring, and with the intention to acquire, record title to all lands between the previously patented lands in Section 31 and the right bank of the

Snake River (with the exception of Lot 6), and in issuing such patent, the United States intended that Resor take such title.

39. After submitting a bid at public auction in March 1959 for a patent to Lot 6 of Section 32, Stanley B. Resor received a patent thereto dated May 21, 1959. Mr. Resor intended to receive by said patent, and believed that he was receiving, title to the lands extending to the Snake River, and the United States intended to grant, and believed that it was granting, such title. At the time of the issuance of the patent to Lot 6, said lot was in or immediately adjacent to the main channel of the Snake River, and that portion of the disputed lands that is currently between the meander line of Lot 6 and the right bank of the Snake River was formed by accretion following the issuance of said patent and the construction of flood control levees by the Corps of Engineers of the United States Army in 1960.

40. Pursuant to authorization under the River and Harbor Act of 1950, Act of May 17, 1950, Public Law No. 516, 64 Stat. 163, the Corps of Engineers undertook a flood control project in the 1950's in the vicinity of Jackson, Wyoming, and included therein plans for strengthening the existing Snake River Ranch levee and extending the same southward. The Board of Commissioners of Teton County obtained from the local landowners, as required by the Corps of Engineers, easements for levee construction which were then granted by the County to the Corps of Engineers. Included in the easements obtained by the County was a right-of-way from Stanley B. Resor for Lot 5 of Section 29, Lot 4 of Section 31 and Lots 2 and 3 of Section 32. In a real estate plat dated June 28, 1957 (or nine days following the issuance of the patent to Lots 2 and 3 to Stanley Resor) prepared by the Corps of Engineers and subsequently filed with the Bureau of Land Management for the purpose of showing the relationship of the rights-of-way to the proposed levee and the land ownership in the area, the

lands between the meander line of Lots 2 and 3 of Section 32 and the proposed levee on the right bank of the Snake River were shown to be under the ownership of Stanley Resor. The patent to Lot 6 that was issued to Stanley B. Resor in 1959 reserved a right-of-way for the flood control project along the west bank of the Snake River. At all times prior to and until the completion of the levee constructed by the Corps of Engineers along the west bank of the river in Sections 29 and 32, the Resor family believed, and the United States recognized and acted consistently with that belief, that Lot 5 of Section 29, Lot 4 of Section 31 and Lots 2, 3 and 6 of Section 32 were bounded on the east by the Snake River and included all accretions.

41. In 1940, the Mountain States Telephone & Telegraph Company applied for and was granted a right-of-way from the Department of the Interior across parts of what are now the disputed lands adjacent to Lots 2 and 3 of Section 32. The right-of-way was specifically excepted from the patent to Stanley Resor of Lots 2 and 3, which indicates that the United States intended and believed at the time of patent that all accretions were included therein.

42. The flood control levee was constructed by the Corps of Engineers in 1960 beginning near the north section line of Section 32, to the west of the meander line in Lot 2, Section 32, and extending south along the old levee constructed in 1943 by the Resor family and concluding at approximately the east-west 16th line in the south half of Section 32. This levee currently constitutes the right or west bank of the Snake River within the boundaries of the Snake River Ranch. The distance between the meander line and the levee within the boundaries of the Snake River Ranch varies from zero to approximately 900 feet. This levee caused the drying up of two substantial braids of the river on the southern portion of the disputed lands, adjacent to and below Lot 6, and has prevented the use of land of comparable size to the east of the

levee as pasture land, the use to which it had theretofore been put by the Resor family.

43. In the 1930's, an application for grazing leases in Teton County revealed to the Department of the Interior the existence of discrepancies between the location of the main channel of the Snake River and the location indicated on the Government plats. Field investigations in Township 40 North, Ranges 116 and 117 West, were conducted by the Government in 1943, 1954 and 1960, and all three investigators indicated in their reports that, in their opinion, omitted lands existed between the meander lines in these townships. In 1962, the Department of the Interior authorized a dependent resurvey of the meander lines in the above townships but, contrary to the requirement in the Bureau of Land Management, "Manual of Instructions for the Survey of the Public Lands of the United States (1947)," the resurveyors were told not to run new meander lines but only to re-establish the previously run meander lines so as to "eliminate the problems created by the shifting positions of the channels from year to year." Following the completion of this survey, a field investigation was made in 1964 of Township 41 North, Ranges 116 and 117 West, and Township 42 North, Range 116 West, and the investigators concluded that, although there was a smaller amount of "omitted land" involved in these townships than in the townships to the south, and although the "character of much of the river bed lying between the revetment dikes has been radically altered by construction activities and the subsequent confinement of the river flow," the lands between the meander lines in these townships had been omitted from the original surveys. Resurveys in these townships were undertaken, under the same conditions as the first resurvey (i. e., the surveyors were not required to run new meander lines), and were completed in 1971. The resurvey of Township 42 North, Range 116 West, and the

plat thereof were approved on November 9, 1973. The resurvey plat depicts the channel of the Snake River from aerial photographs and USGS quadrangle maps; no new meander line of the river was surveyed in the field. Thus, examination of this plat does not reveal whether at any given point there exist lands between the Owen meander line and the bank of the Snake River.

44. The Department of the Interior has considered the meander lines in these townships to be fixed boundaries since the dates of the investigations described in paragraph 43 hereof, but the Resor family had no knowledge that the Government would make any claim to riparian lands within the boundaries of the Snake River Ranch in Township 42 North, Range 116 West, until the United States caused the resurvey to be made in the township in 1971. The Resors have received no notice from the Government that they are trespassing on Government lands in Sections 29, 31 and 32, Township 42 North, Range 116 West, and have not at any time been asked to leave said lands or to remove their improvements therefrom.

45. Plaintiff and its predecessors have continuously possessed and asserted title to all riparian land between the meander line in Sections 29, 31 and 32 within the boundaries of the Snake River Ranch and the thread of the Snake River since at least 1929. Until the filing of the resurvey plat by the Government for this area on January 31, 1974, Defendant through its officers, agents and employees recognized and acknowledged that the patents of Plaintiff's predecessors to the meander line lots carried title to the thread of the Snake River.

46. No evidence appears in the record that at the dates of patent of Lots 2, 4 and 5 of Section 29, Lot 4 of Section 31 and Lot 6 of Section 32 there existed any appreciable accretion between the meander line of said lots and the right bank of the Snake River.

47. Plaintiff's predecessors did not know or have any reason to suspect that the lands embraced by the patent to Lots 2 and 3 of Section 32 exceeded the acreage of said lots stated in the patent or that the United States asserted or would have reason to assert title to any riparian land between the platted lots and the river.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of this action under 28 U.S.C. § 1346(f) and has jurisdiction of the parties. Plaintiff is a general partnership duly created and existing under the laws of the State of Wyoming and has the capacity under said laws to maintain this action.

■ 2. Meander lines are run in surveying fractional portions of the public lands to define the sinuosities of the banks of watercourses and to ascertain the quantity of land in the fractions subject to sale and to be paid for by the purchaser; they are not the boundaries of upland lots but merely manifest the existence of water boundaries that fluctuate with subsequent erosion, accretion and reliction.

■ 3. An exception to the foregoing rule exists when the meander line survey was fraudulent or so grossly in error as to constitute a fraud upon the United States and the meander line so far departed from the water boundary as to manifest an intention not to delineate a water boundary; in such circumstances, the meander line becomes a boundary to the upland lot.

■ 4. The exception to the general rule is to be applied with great caution and only when the error in the survey is substantial, wholly unexplainable and evidences fraud. The mere failure of the surveyor to delineate the precise boundary of a water monument or to show all of the sinuosities of a channel is not gross error or fraud; the meander line need only approximate the actual waterline, and the omission of comparatively small areas lying between the meander line and the shore does not render such areas omitted lands.

■ 5. One asserting that the meander line of a particular lot is the boundary of the lot must prove by clear and convincing evidence that the water monument could not have been at or near that portion of the meander line at the time of the survey.

■ 6. Fraud or gross error must be shown with respect to each segment of a meander line that is asserted to be a boundary of an upland lot; fraud or gross error cannot be imputed to particular segments of a meander line survey from fraud or gross error in other places along the meander line of the same survey or of other surveys.

■ 7. The Government has not sustained its burden in this case of proving by clear and convincing evidence that the main channel of the Snake River was not at or near the meander line of the west bank run by William Owen in May 1893 on what is now the property of plaintiff Snake River Ranch in Sections 29, 31 and 32, Township 42 North, Range 116 West, 6th P.M., Teton County, Wyoming. There has been no showing that this portion of the meander line did not approximate the sinuosities of the Snake River or that the disputed lands were land in place at the time of the Owen survey. Accordingly, the Government has not proved that the disputed lands were omitted from the Owen survey whether as an island or as part of the mainland.

■ 8. Even if the right bank of the Snake River within the boundaries of the Snake River Ranch in Sections 29, 31 and 32, Township 42 North, Range 116 West, 6th P.M., Teton County, Wyoming, at the time of the Owen survey was in the location identical with the present bank line, the Government has not sustained its burden of proving fraud or gross error in that portion of the meander line. Considering the date of survey, the remoteness of the region and value of the land at the date of sur-

vey, the difficulty surrounding the work of the surveyor and the per-mile method of payment specified in the contract, the accuracy obtained by Mr. Owen was proportionate to the effort required to obtain it. Recent increase in land values, making precisely accurate surveys feasible and worthwhile, cannot impeach earlier surveys that were reasonable under the circumstances existing at the survey date.

9. Assuming no shift in the right bank of the Snake River on the Snake River Ranch since the time of the Owen survey, the survey discrepancy does not constitute fraud or gross error because it is not obvious enough, when viewed in connection with the official plat and other evidence available to the patentees and their successors, to have charged the subsequent purchasers with notice of fraud or mistake and thereby make them aware that the meander line was intended as a boundary line.

10. In all events, a discrepancy between the meander line and the bank of the river of zero to 900 feet is not sufficient to constitute gross error or fraud.

11. The subdivision and measurement of land between meander lines of nonnavigable streams is not necessary for the disposal of said lands or of other lands within a township by the United States; it has been the policy of the United States from the beginning to measure the price to be paid for land adjoining such watercourses by the quantity of upland alone and to make no charge for the land in the bed of the watercourse, and the United States will always be deemed to have intended that such submerged land pass with patent to the adjacent upland unless the contrary intention is clearly manifested.

12. The requirement of the 1890 General Land Office "Manual of Surveying Instructions for the Survey of the Public Lands" that a surveyor measure the crossing distance between meander corners on a meandered watercourse was not a requirement that a survey line be drawn across a meanderable stream either to subdivide public land or to close the survey. The failure of Owen to make such a crossing on the north section line of Section 32 in Township 42 North, Range 116 West, or in any other part of the township did not void the survey of the township, did not affect the disposal of public lands in the township and had no effect on the meander line of the west bank of the Snake River in Sections 29, 31 and 32 as an approximation of the sinuosities of the watercourse.

13. The approval of and authorization of payment for the Owen survey by the United States Surveyor General, despite the acknowledgment by Owen in his field notes in several places that he did not measure the crossing distance between meander corners on the Snake River in Township 42 North, Range 116 West, constitutes a determination and admission by the duly authorized agent of the United States that Owen completed his survey in accordance with his instructions despite not having made such crossings, and such administrative determination may not be reversed at this late date by the Government in a manner impairing rights vested on the basis of such determination.

14. Even if the failure of Owen to make crossing ties would have rendered his survey incomplete under the 1890 Manual, the Surveyor General was empowered to and did waive such requirement and pay Owen for having completed his survey, just as the Department of the Interior waived the requirement of the 1947 Manual that new meander lines be established during the 1971 dependent resurvey of the Owen meander line in Township 42 North, Range 116 West.

15. And, in any event, the failure to complete a survey does not in-

validate that portion of the survey that was completed and approved; the accurate and complete survey of the meander line of the west bank in Sections 29, 31 and 32 permitted the United States to dispose of the platted lands in the manner provided by law.

16. The Government has not proved that the line run by Owen in Sections 29, 31 and 32, Township 42 North, Range 116 West, 6th P.M., to depict the west bank of the Snake River did not in fact constitute a meander line, that said line was intended only to separate river bottomland from the adjoining upland or that Owen did not find and survey the bank of the river in that area. The field notes and the hydrologic, cartographic and geomorphological evidence of record establish that Owen did in fact run a true meander line along the west bank of the Snake River on what is now the Snake River Ranch.

17. By Executive Order 5040, the United States withdrew from entry all lands between the section line between Sections 31 and 32 and the right bank of the Snake River in Township 42 North, Range 116 West, 6th P.M. Pubviously been withdrawn and thereby relic Land Order 1077 opened for entry all lands in this township that had prestored to entry all lands between the meander line and the right bank of the Snake River in Section 32 of the township. All said lands adjacent to Lots 2 and 3 of said Section were included in the color of title patent to Lots 2 and 3 granted to Stanley B. Resor on June 15, 1957, pursuant to 43 U.S.C. § 1068; all said lands had been occupied and improved by the patentee since 1929, all said lands were included in the color of title application, and the Government knew by its agents and officers in the Department of the Interior and the Corps of Engineers of the United States Army that all said lands existed. By failing to reserve said lands from the patent, the parties thereto manifested

their intention that said lands be included therein, and such intention is controlling in construction of the boundaries of the land patented.

18. In the absence of manifestation by the United States of an intention to reserve accreted lands from the patent to Lots 2 and 3 of Section 32, and in the absence of knowledge by the patentee or reason to suspect that there were such accretions or that the United States intended the meander line of said lots to be a fixed boundary, the specification of acreage in the patent does not control over the call for a natural monument in the official Government plat incorporated within the patent. In such cases, patent to the meander line lots carries title to the thread of the adjoining nonnavigable stream and includes all accretions to said lots occurring both before and after the time of patent. Therefore, the patent to Lots 2 and 3 of Section 32 as well as the patents to Lots 5 of Section 29, 4 of Section 31 and 6 of Section 32 carried title to the thread of the Snake River as it may exist from time to time.

19. The United States cannot now be heard to attack the riparian title of plaintiff to the disputed lands when long periods of time have elapsed both from the time of survey and from the time of patent of the platted lands, when the riparian lands have been improved and occupied by the upland owners continuously for over 45 years, and when Government agents have acknowledged, confirmed and acquiesced in the riparian title claimed by plaintiff and its predecessors to the disputed lands in the face of knowledge for at least the past 35 years that the disputed lands existed.

20. In the light of the foregoing, judgment will be entered in favor of Snake River Ranch, a general partnership, and against the United States of America, quieting title to the lands constituting the subject of this controversy.

See Appendix on following page.

APPENDIX A

| PATENT NO. | | ACREAGE | TOTAL ACREAGE |
|---|---|---|---|
| 813091 | Lot 2, Section 29 | 34.39 | |
| | Lot 4, Section 29 | 19.23 | |
| | Lot 5, Section 29 | 48.66 | 102.28 |
| 1172805 | Lot 2, Section 32 | 27.79 | |
| | Lot 3, Section 32 | 3.95 | 31.74 |
| 1149681 | NE1/4NE1/4, Section 31 | 40 | |
| | NW1/4NE1/4, Section 31 | 40 | |
| | NE1/4NW1/4, Section 31 | 40 | |
| | SW1/4NE1/4, Section 31 | 40 | 160.00 |
| 354856 | SE1/4NE1/4, Section 3 | 40 | |
| | Lot 4, Section 31 | 39.30 | |
| | Lot 5, Section 31 | 39.99 | 119.29 |
| 1195758 | Lot 6, Section 32 | 0.98 | 0.98 |

Scale 1" = 1000'

ACREAGES ---- G.L.O. RECORD

| Section 31, Lot 4 | 39.30 Acres |
|---|---|
| Section 32, Lot 6 | 0.98 Acres |
| Section 32, Lot 3 | 3.95 Acres |
| Section 32, Lot 2 | 27.79 Acres |
| Section 29, Lot 5 | 48.66 Acres |
| Section 32, Lots 2 and 3 | 31.74 Acres |

indicates accretion lands — 55 acres

indicates eroded lands — 3 acres.

indicates Snake River Ranch and Snake River Associates.

indicates Snake River Ranch

"SNAKE RIVER RANCH"
MAP SHOWING
SECTIONS 29, 32 AND 31
T42N      R116W
TETON COUNTY, WYOMING

CIVIL ACTION NO C 74-91
PLAINTIFF'S EXHIBIT No 19c